Hear ye, hear ye, hear ye, the United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States in this honorable court. The first case for today is 2018-60813 Cerritos-Quintanilla versus William P. Barr. You may proceed. Good morning. You may please the court. But for the fact that petitioner Luz Cerritos-Quintanilla is the mother of Wilmer Gomez, a young man who was threatened by gangs in his home country of El Salvador, she would never have herself been threatened by gangs and she would not currently be terrified of being returned to El Salvador. Wilmer was threatened by the MS-13 who in turn extended their threats to the petitioner, Ms. Cerritos-Quintanilla, the primary petitioner in this case. We intend that Ms. Cerritos-Quintanilla was persecuted on account of her membership in the social group of family and that that was at least one central reason why she was persecuted. I'll say at the outset that for a plethora of reasons I'll discuss, this case should be vacated and remanded to rectify an entire series of errors that the liberal courts committed. While this case is about a woman who fled for her life after receiving death threats by gangs, it's also about much more than that. This case presents this honorable court with the opportunity to rule on matters of law of great importance regarding how asylum cases will be decided moving forward in this circuit and possibly beyond. First, this court can join at least eight other sister courts of appeal in holding that family relationships do constitute a particular social group for asylum purposes. And second, the court can rearticulate and solidify this standard, the correct legal standard for applying the nexus analysis, namely the at least one central reason analysis codified at 8 U.S.C. 1158 and articulated by a line of cases both by the BIA and by this court since 2007. Further, as the fourth, seventh, and eleventh circuit courts of appeal have done, this court can clarify how that standard can apply in this case in these sets of facts. Put another way, denying this petition for review would place this circuit in conflict with at least three other circuits that have sided with this petitioner on this issue of nexus around these sets of facts, the fourth, seventh, and eleventh circuits. And again, under the Constitution, Article 1, Section 8, its uniformity is certainly favored in the immigration laws. There are at least two issues. Is there already a circuit split on the family group? I'm not aware of one, Your Honor. As far as I understand, except for the tenth and the eleventh circuit, the court has ruled that family membership is a particular social group. I don't think there's anything adverse in the tenth or the eleventh circuit. I thought we have actually, in some unpublished opinions, cast some doubt on whether it's a recognized social group. What I would say, Your Honor, is I know in Peña-Oseguera, which is one of the cases I'm sure we'll talk about, that court did say in its very last paragraph that that, I mean, it sounded like the way they put it was it that was not at odds with the precedence of this court. So, you know, I mean, it's not been established in this court. I'm not aware right offhand of any of any unpublished decisions on that point, Your Honor. But as far as I know, it's it's an open question in this court, at least even to the extent that there were unpublished decisions. I guess this court could finally publish a decision determining that. Is it even clear that the that the BIA was looking at the right person here? It seems all very convoluted. Your Honor, thank you. So what I would say is in Peña-Oseguera, what happened was, I mean, I think the BIA was looking at the correct person here. To answer your question, Your Honor, what I'll say is in Peña-Oseguera, there was a conflation. There were two reasons that the court remanded to the BIA, to the lower courts. One was there was a conflating of the mother's and the son's facts. And so the this court felt it necessary for, you know, to remand on that basis. But they also remanded for an LEA, you know, the Attorney General's LEA decision for a more particularized analysis on the particular social group, which we can certainly discuss shortly. The other issue that that this court that presents itself in this case is how is the at least one central reason nexus analysis to be applied in cases such as this, where family membership is a particular social group. Since the BIA's decision in matter of Acosta in 1985, for 35 years, in that case where kinship was recognized as a cognizable social group, for 35 years, both the board and sister circuit courts of appeal have continued to uphold family as a cognizable social group. In LEA, matter of LEA in 2017, the board issued a decision where they didn't make any bones about the fact that family was a particular social group, but they denied nexus on case facts very different from the ones in our case. In that case, there was a father who owned a store and a drug cartel approached the father saying, hey, we want you to allow us to sell drugs at your store. And he refused, and so they went to the son, who had independent authority, presumably, to also allow for that to happen. And the court said, look, you don't have nexus. It's not because of your relationship with your father that we're denying you, that you were threatened. It was because you're of your independent authority to allow them to sell drugs at that store, and that was the primary reason, or that was, that was the main reason, and your relationship with your father was not even at least one central reason. In this case, Your Honors, there's no other possible reason that the gangs could have threatened Ms. Cerritos-Cantina, but for her relationship to her son, she would never have been threatened. I mean, and there are other cases, the first LEA case from 2017 cites, you know, there's an Eighth Circuit case, something called Cambara-Cambara, where, you know, I mean, people may have independent things that the gangs or perpetrators could get from them. I'll just, I'll speak to this court. In this court, denied relief to a woman who was the sister of a guy who was threatened, and then they threatened her, and she claimed that she was part of a family member. Her family membership was because of the brother, but what she was being threatened for was the gangs were actually, or the perpetrators were trying to get specific information out of her, and so the court ruled it didn't matter that she was a sister. The fact that she was a sister is tangential, which is part of the legal analysis. It was tangential or insubordinate, or I didn't support it, it was tangential or superficial, or it wasn't primary, and so they said irrespective of her relationship to that person, they would have still threatened her because she had the information they needed. In our case, there is nothing whatsoever that Ms. Cerritos-Quintanilla has, except for her mother-son relationship with Wilmer. That could have been the reason. Mr. Shaw, can you articulate exactly what you want us to do, and the reason that you want us to do? Thank you, Judge Elrod. Let me tell you what a few things are, if you'll give me a few moments, because there are a couple of things. One is, I think this court should vacate this decision and remand it to the board to apply the proper legal standard. The Board of Immigration Appeals decision, it was just less than a page, and in one paragraph, essentially what the board said was, they couched this as a means to an end, a means to an other as a means to an end, and that's insufficient to establish a claim. A means to an end analysis is the wrong standard, your honor. Starting 2005, the REAL ID Act, which was again codified at USC 1158, the appropriate provisions, talked about at least one central reason for the harm being the nexus analysis. Now, it's not just any reason, but it's also not the one dominant reason or a primary reason. There could be numerous central reasons, maybe not a hundred, but at least one central reason, and that's actually the language in the statute in the matter of JBN, the board's decision in 2007 that really helps articulate and understand the REAL ID Act's provisions, really talks about a little bit of the congressional history, and it talks about at one point they were even going to say a central reason, but they even kind of dampened that and said at least one central reason because of the issue of mixed motives. You know, as human beings, people just don't have one motive, and they were trying to recognize that in the law that, look, you know, people could have numerous motives. I mean, gangs, I mean, I know that the argument keeps getting thrown about that gangs are trying to expand their criminal enterprise. Well, of course they are, but that doesn't mean that there aren't other reasons that they do what they do. So first, getting back to your question, Judge, I'm sorry. Yes, so we need to, we'd like for the court to remand to the Board of Immigration Appeals to apply the proper legal standard. The second thing we would like for the board, this court to do, is to also, keeping in mind, of course, sort of in conjunction with the first thing, the but-for analysis, that there's no other reason that Ms. Cerritos-Quintana would have been attacked or threatened, I should say, to remand it for that finding. The third thing I would say, Your Honors, is if you look- Wait a second. So on that one, remand because the finding is wrong. The nexus analysis, I apologize, Your Honor, I'm sorry. Let me let you finish. No, I'm just trying to, what is the basis for remanding on that ground? Please articulate that. Sure, thank you, Your Honor. The substantial evidence in the record shows that there was no other reason that Ms. Cerritos-Quintana could have been threatened, and so using the but-for standard, the nexus analysis not appropriately or properly applied in her case, and so the board should remand on that basis as well. Is that because it used a wrong standard with the nexus analysis, or is it because you think that the facts are so one-way that it couldn't have, it got it, just got it wrong? Your Honor, I would say maybe both. I think it's clear that the wrong standard was used. The immigration judge and the Board of Immigration Appeals opinion, both of those opinions conflate particular social group with the nexus analysis, first of all, and I'll get to that in just a moment, but I don't think they looked at the record properly. So, I mean, to say that the criminal enterprise was the reason, again, they're setting up an either-or distinction that's not, that doesn't exist in the statute. The statute doesn't allow for either-or. It allows for many motives, for mixed motives, and I also think that... Are these different, the one and two that you've just given us, and I think you're going to give us a three, are one and two totally separate stand-alone reasons to remand, or do they have to, you have to hit a home run on all of the bases to get a remand? I think we can do any one of the reasons I will discuss, Your Honor, and I would say, to be fair, they're somewhat intertwined, so it could be like one and 1A, but I did want to articulate that for the court that that but for, that substantial evidence of the record does, does not indicate, shows that there's just no other possible reason that, but for her relationship with her son. So, I mean, I wanted to specifically speak to that factually from the record, as well as talk about the legal standard in point one that I made, that the legal standard that was at the lower court that was applied was wrong. Okay, is there a three, or is that it? Well, I just want to make a point out to the court in terms of there being a three. In Peña Oseguera, the court did remand that case so that the lower courts could look at the LEA-2, the Attorney General's prescription to have a particularized case-by-case analysis of the particular social group. Both the immigration judge and the BIA's decision in this case, they conflated that and they never actually arrived at whether the particular social group was a cognizable one or not. Now, there's two ways we can look at that, Your Honor. One way is they could just, we could just assume it. Maybe they assumed that family membership is a particular social group. If that's the case, then remanding it for that basis, obviously, it doesn't make sense. But to the degree that they didn't do that analysis and this court would find it valuable for them to do that as well, in order for them to do the step-by-step analysis that's required in an asylum case like this, that would be valuable. Let me ask you this, because what strikes me here is you said there can't be any other reason she's being threatened, but the truth is there's a lot of moms who have no influence on their sons and then there's a lot of moms who do. There's a lot of other people who do. There's people who have influence over, you know, Mr. X who are not related. And given that the sister has been left completely fine, the mother was threatened, isn't the reality here that the reason she was threatened was because she has influence over the son? Regardless, I mean, obviously she got to know him as his mother, I get that, but it's the influence she has over him, not, oh, any member of the X family is going to be killed because they're a member of the family. It's, we want to put pressure on this guy to join our gang and we think this lady's the lady to do it, as opposed to the sister, a brother, a cousin, an uncle, somebody else. Thank you, Judge Haynes. Let me answer that question. I think that's a fair point you're raising and let me just point the court to Hernandez Avalos, a Fourth Circuit decision from 2015 that we cited in our briefing. And in that case, it's almost identical to the current case. A mother in El Salvador was threatened because her son wouldn't join the gangs and in that case the court said the BIA's conclusion that these threats were directed at her not because she is her mother, she is the mother, but because she exercises control over her son's activities, draws a meaningless distinction under these facts. It is therefore unreasonable to assert that the fact that Hernandez is her son's mother is not at least one central reason for the persecution. So that's how the... Here we have the extra piece of the sister being okay. So we know that it's not like the gang has said, we are now going to go and get every member of the Cerritos Quintanilla family and kill them because he didn't join our gang. That would be the family. But here they leave the sister just fine, go after the mother because of the influence. So it's not and it's not a ridiculous conclusion and given our deferential standard of review, it's not a required conclusion that it's because she's a member of the family, right? Thank you Judge Haynes. What I would say in response, Your Honor, is this court has been one of the few courts who sometimes look at it look at issues like that or look at factors like that. I know that for example in the Seventh Circuit there's there are a couple of cases holding that, you know, first of all I'll say there's nothing in the asylum statute that says that you have to look at every member of that social group to see whether they're okay or not. We're looking at this specific person. The Seventh Circuit, I'll just talk about this circuit, in Singh versus Holder, I'm sorry, in Singh versus Barr, this court looked at the fact that there was this gentleman who was escaping religious and political persecution from India and the rest of his family was there and the court agreed with what you're saying, Your Honor, so if the rest of the family's there, how can we say that you're, you know, you should get this relief? But in that case it was distinct because he was, they all had that political affiliation and they all had that religious, you know, affiliation, so there if you're saying that if that petitioner was saying that he was persecuted because of his religious and political beliefs, well then sure, those people could easily be persecuted as well and how are they safe? But in this case, Your Honor, what's distinct is I understand that Fatima, the sister, is still there but their goal was to recruit, their goal, the gang's goals are, goals are to recruit males into their ranks. So now that Wilmer is here, they, it's kind of like it's taken the expression, there's nothing they can, there's nothing to be gained at this point. They didn't threaten Fatima when he was there, did they? Is there any evidence of that? Your Honor, I don't think there's evidence of that in the record. What I do know is when they came here, what was asked in immigration court at the testimony was is she still there and the answer was yes, she's still there. The other brother and sister, I think there were two, a brother and sister who also came in, they're both in the United States as well as unaccompanied minors. Counsel, can you address Gonzales Feliz V. Barr? Can I address that, Your Honor? Yes, you know, we talked in Gonzales Feliz V. Barr, we talked about futility of whether it should go back and basically we said in that case that even assuming that the altered the standards for asylum, that Gonzales Feliz was not entitled to remand because under matter of ARCG, the easier burden she failed to satisfy. It seems like it's very unlikely that the agency would find the immediate family to be a cognizable group and so I'm wondering if under the agency, very unlikely under either any standard. So I'm wondering if it's futile. Thank you, Your Honor. What I would say about that is, I don't know, to me, in response to what you're saying, I think the substantial evidence or evidence in the case, and if you look at the matter of JBN and the shake the holder and then, you know, the even Pena Oseguera, at least one central reason had to be the the mother-son relationship. I mean, if they want to say there was some other reason, okay fine, but that doesn't eliminate the fact that this was at least a central reason. I know that the Gonzales Feliz case, Your Honor, also adopted the the standard for how to determine a particular social group that was established, clarified in MEVG and WGR at the BIA in 2014, but I would, I would contend that it wouldn't be futile to remand this because they didn't even apply A, the right standard, and B, they didn't properly look at the facts and the substantial evidence of the record. Thank you. You've saved time for rebuttal. We'll hear from Mr. Yes, I don't see the clock. Oh, am I out of time? I apologize. You're out of time, yes. You've saved time for rebuttal. I have, yes. We'll hear from Ms. Camilleri now. Thank you. Good morning. May it please the court, this is Dana Camilleri for the Attorney General. This case turns on a single issue, whether petitioners showed that their fear of future harm was on account of a protected ground or a nexus to that protected ground. The agency clearly assumed without deciding that the family was a cognizable group and moved to the nexus to termination. In this case, the record shows two anonymous threats to the door of the lead petitioner. She does not say exactly what the contents were, but she said the gang members wanted extortion and one of her son recruited two in-school threats to the son trying to recruit him and trying to extort money. A member of their particular social group remained safely in El as Judge Haynes pointed out. All of this was simply insufficient to meet their burden of showing nexus to a protected ground. I realize that there are some, the Fourth Circuit case with the but-for, but the board and the agency relied on LEA 1, whose nexus framework was not changed by LEA 2, and that requires the means to the end analysis. And here, even petitioners, she's asked, did they just want money in to recruit your son? And she says yes. And there's also Fifth Circuit case law saying that's insufficient for nexus, albeit that is before LEA. In terms of the supplemental briefing, dealing with Kenya, we view that as easily distinguishable. As the court noted in that decision, the IJ didn't even mention particular social group, did not explain whether they were As opposing counsel pointed out, the agency had also conflated the son's claim with the mother. We don't have that situation here because the derivative beneficiary here did not file a separate asylum application and did not even testify at the merits hearing. And so we view that as a very different situation, and it was really remanded because the IJ had made factual findings, which the board is prohibited from doing, that were probably influenced by the incorrect legal posture before the IJ. So we don't, we don't believe that remand is necessary. And we don't Can you address, there does seem to be to me a little bit of confusion. Where the mother was threatened, because there's allegedly because her son refused to join the MS-13. But then says that because the son was not targeted for family reason, and a nexus doesn't exist. Isn't the analysis, the mother's nexus, not the son's nexus? And so there's a conflation in the BIA and in the briefing. So it's the mother's nexus that is at issue, not the son's nexus, isn't it? That's true, but it's a little confusing because the social group that was proffered actually revolves around the son and immediate relatives of the son versus immediate relatives of the mother. And I think that that's why. Okay, I'm sorry. So go ahead. No, you're I'm sorry. I think that that's why it reads a little bit as if it's conflated. But the lead petitioner was the only one testifying, and it's really her evidence that is being evaluated here. Well, and the petitioner has not made the conflation argument that was central in Pena-Osagiea at all here. No, in fact, he's, I believe he just said that he did not believe that that was present in this case. But I'm asking if it is. And so, and that is a basis for us to send it back if there's a conflation. So I'm just trying to figure out a conflation so we can talk later about our opinions on the case. But do we have any more questions? I want to ask about that. Is it are we allowed to just go off on something that was not raised in the BIA or in our court and just rule on that there when no one raised that? I don't want to question the authority of the court. But I think that argument has been waived at this point. It could have been raised in supplemental briefing, and it wasn't. It could have been raised on direct, not direct, excuse me, but I don't think anyone is arguing for that at this point. Okay. And are you aware of authority that would say other than a jurisdictional point, we can just wake up and raise something ourselves in a BIA appeal? No, I am not. Okay. But if we believe that there's some error that is that is consistent with our precedent, we can point that out, can't we? Yes, Your Honor. I I guess I'm a little confused where you see the conflation in the decision. If you could point me to what is troubling you, that would be great. I don't want to take your time right now. I don't have the page numbers right here, but so you believe that that's not present, and we don't have to worry about that. Is that correct? My reading of the decisions was that it was evaluated in terms of she received the threats because they wanted to recruit her son and extort money from both of them, and that that was simply inappropriate. Insufficient for Nexus because they had criminal motives, and that was why they left the two anonymous threats on her door. And that's the other thing. The threats were anonymous. She doesn't know exactly who sent them. She testified that she assumed it was someone at her son's school who is a gang member, but that was there's really not a lot of testimony, specific testimony in this record on that. And so I would argue they have not met their burden. Is there, so is there any evidence that it's for a different reason in the record? No, Your Honor. Okay. Do you have anything else? Does anybody else have any questions? Yeah, I think we have your argument. Okay. Thank you very much.  Thank you, Judge Elrod. Just at the top, I'd like to address that we're also not claiming anything like Peña Oseguera, that there was a conflation of facts between the mother and the son. A couple of things. Government counsel just mentioned once again, adherence to the means to an end standard, which we are vehemently opposing and saying that that is in conflict with the statute. Gonzales Ruano is, I think it's a Seventh Circuit case, and in that case, and I did cite it in our, part of our supplemental briefing or 28G letter, the petitioner refused to have his wife be owned or his property by a cartel. A drug lord wanted to quote-unquote possess the wife. And in that case, the judge, the court specifically says that, you know, they're compelled to remand because this means to an end analysis doesn't make sense. And the court said, you know, the argument goes he was not persecuted because he is a member of Catalina's immediate family, but because as her husband, he was the one person preventing the cartel from forcibly recruiting her. We confess that this argument draws a finer distinction than we can discern. And as in Hernandez-Avalos, the case I mentioned a bit earlier, Gonzales Ruano's relationship to his wife was the reason he and not someone else was targeted. I would just once again contend, Your Honor, that that is, the law is so clear on that. I mean, it's at least one central reason. There's nothing in the record that could be the reason that Ms. Cerritos-Quintanilla was harmed. A couple of other things I want to mention. I do want to just say the point, if the court will allow me to use a little bit of a colloquial term, hair splitting. I think what happens in a lot of these cases is there's this immense amount of hair splitting where, oh, it's really not because of the person, it's because of the person's influence over the person, or it's because of the person's, I don't know, the person's, it's the criminal activity of the gangs. And when you look at this line of cases that I've pointed out to the court in the briefing, the Fourth Circuit's, you know, Hernandez-Avalos, and there are a couple of the cases after that. The Seventh Circuit's, Gonzales Ruano, and the Eleventh Circuit's Perez-Sanchez, which by the way was remanded. The government's counsel mistakenly wrote in their briefing that it wasn't, but it was remanded. The courts are not willing to hair split to this, to such a large degree. The final point I'd like to make, Your Honors, is there is one other point that should be, the case should be remanded for, and it's a fact issue. The immigration judge at the record at page 42 says that because there was no nexus, she's not, this person doesn't have a well-founded fear, subjective, or object of returning. But the nexus analysis, first of all, the particular social group analysis wasn't necessarily conducted. It's left very vague. Second of all, the nexus was improperly determined because of the wrong standard and because of not looking at the substantial evidence in the record. And therefore, you can't go to the next step and even determine well-founded fear of future persecution because the first two steps weren't properly done. So the court, this court needs to vacate and remand to the immigration court for that fact-finding, because obviously this court doesn't do fact-finding and neither does the BIA. But the BIA has to apply the proper standard at some point, which is one of the reasons for the remand we requested. And the  whether Ms. Quintanilla has a well-founded fear of future persecution. I apologize. I can't see the clock for some reason. So just please let me know when I'm out of time. You have a minute and 34 seconds. Thank you, Judge Elrod. And those are the major points I wanted to make. I mean, we're not, you know, in Peña o Segura, there were two independent reasons that the case was remanded. The court said, okay, there was the conflation with the mother's son. We're not claiming that here. There's nothing like that. But there's also the issue of having the particular social group be properly analyzed according to the Attorney General's LEA decision. To the extent that in this case, like I said, there's two ways of looking at it. You can either have it be that both the lower courts assumed the IJ and the BIA assumed that the family social group, particular social group was met, the membership was a particular social group, or they just conflated it like the Attorney General did in his LEA decision and didn't properly address it. To the extent that that would be important for the nexus analysis and the self-founded fear analysis to apply and to move forward, this court could remand on that basis as well. But this court has numerous bases and they don't all have to be, it could just be even one of the reasons that we've articulated today, Your Honors, on a very narrow ground, at least, at the very least, to remand to the BIA for the application of the proper standard. The means to an end is not the proper standard in this case. It is the at least one central reason standard that other sister courts have upheld. They're not willing to do the hair splitting and the means to an end analysis just does not hold. Can I just mention, Mr. Shaw, I don't know if this is the problem, but if you look in the upper right-hand corner, you can make this a group and then you can see all of us and you would see Ms. Trice. If you've got it on the one where just who's talking is who you see, then you wouldn't see her because she's not talking. But if you click on the group, then you see all of us, which includes Ms. Trice, who has the clock. That's just for future reference. Thank you, Judge Haynes. I actually see all of you and I see Ms. Trice and I see the clock, but her name and it says courtroom deputy covers the clock, so I can't tell what time it is. That's strange. Okay, fair enough. I appreciate that. And Judge Elrod, if I could have one minute before we bring in the next group after we're done with this one, I would appreciate that. Okay, certainly. This case is submitted. We appreciate the arguments of counsel and thank you very much. Thank you, Judges.